# Exhibit 2

## SECOND AMENDMENT TO
## MASTER SERVICES AGREEMENT

This Second Amendment to version 3.1 of the NKR Contract (this "**Second Amendment**") is made and entered into as of _____, 2021 ("**Second Amendment Effective Date**") between University of Colorado Hospital Authority, a body corporate and political subdivision of the state of Colorado (the "**Member Center**" or "**MC**"), and KidneyLife Foundation, Inc. d/b/a National Kidney Registry, a New York not-for-profit corporation, ("**National Kidney Registry**" or "**NKR**").  Member Center and NKR are sometimes referred to individually herein as "**Party**" and collectively as the "**Parties**."

WHEREAS, NKR and MC previously entered into that certain Service Contract with an effective date of December 3rd, 2015 (the "**Service Contract**"), pursuant to which MC wished to enroll participants into the NKR program and NKR agreed to perform computerized match runs to find paired exchange matches and coordinate to facilitate transplants, in accordance with the terms thereof; and

WHEREAS, the Parties previously entered into that certain Donor Center Agreement with an effective date of December 3rd, 2015 (the "**Donor Center Agreement**") in which MC agreed to participate in paired exchanges organized by NKR; and

WHEREAS, the Parties previously entered into that certain All In Addendum with an effective date of December 18, 2015 ("**All In Addendum**");

WHEREAS, the Parties previously entered into that certain Amendment with an effective date of December 2nd, 2015 (the "**First Amendment**"), to modify the Member Center Terms and Conditions by amending the Service Contract; and

WHEREAS, the Parties agreed as a part of the Service Contract to abide by the current Member Center Terms and Conditions as posted on the NKR website;

WHEREAS, the Parties wish to amend the Service Contract and Member Center Terms and Conditions, as amended by the First Amendment, as set forth herein; and

WHEREAS, the Parties wish to memorialize the termination of the All In Addendum.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree to amend the Service Contract and Member Center Terms and Conditions as follows:

1.      <u>Definitions</u>.  Any capitalized terms not defined herein shall have the same meaning as assigned to those terms under the Service Contract and Member Center Terms and Conditions.

2.      <u>Conflicting Terms</u>.  To the extent there is a conflict between the terms of this Second Amendment and the terms of the Service Contract, Member Center Terms and Conditions, or the First Amendment, the terms of this Second Amendment shall control.

3.     Termination of Certain Agreements/MC Status.  The Parties hereby agree to terminate the All In Addendum as of the Second Amendment Effective Date.  Additionally, effective as of the Second Amendment Effective Date, the Parties agree that MC shall no longer be considered a "Center of Excellence" as provided in Section I.5. of the Member Center Terms and Conditions.  For the avoidance of doubt, NKR acknowledges and agrees that MC shall not be subject to any liability under Section I.3. of the Member Center Terms and Conditions related to "net chains started" given it is no longer a party to the All In Addendum.

4.     Amendments to the Service Contract.

a)  The Parties agree to amend the Service Contract as follows:

i.     Section 2 of the Service Contract is hereby deleted and replaced with the following:

"The MC agrees to abide by the Member Center Terms and Conditions, as attached as Exhibit A to the Second Amendment, as modified by the First Amendment, the Second Amendment, and any subsequent amendments to the Service Contract or to the Member Center Terms and Conditions as mutually agreed upon in writing and signed by the Parties."

ii.     A new Section 6 is hereby added to the Service Contract as follows:

"The Service Contract, the Member Center Terms and Conditions, as attached as Exhibit A to the Second Amendment, each as modified by the First Amendment, the Second Amendment, and any subsequent amendments mutually agreed to and executed by the Parties shall collectively be referred to as the "Agreement.""

b)  The Parties agree to amend the Member Center Terms and Conditions attached hereto as Exhibit A as follows:

i.     Section I.2. is hereby deleted and replaced with the following:

"Consistent with Section 2 of the Service Contract and Section 1.7. of this Agreement, all Member Center Requirements (MCRs) and all Medical Board Policies may not be amended or modified except by written agreement of both parties."

ii.     Section I.7. is hereby deleted and replaced with the following:

"Consistent with Section 2 of the Service Contract, these Member Center Terms and Conditions may not be amended or modified except by written agreement of both parties. In the event that NKR offers amendments to the Member Center Terms and Conditions to other member centers, NKR shall notify MC of such amended terms and provide an opportunity for such terms to be incorporated into this Agreement to the extent requested by MC in its sole discretion."

iii.     A new Section I.8. is hereby added after Section I.7.:

"8. Any capitalized terms not defined herein shall have the same meaning as assigned to those terms under the Service Contract."

iv. Section II is hereby deleted in its entirety and replaced with the following:

"II. SECONDARY RESEARCH USE OF DE-IDENTIFIED DATA

1. MC acknowledges that the Common Rule, which regulates human subjects research and is codified at 45 C.F.R. Part 46, permits an exemption to Institutional Review Board ("IRB") approval at 45 C.F.R. § 46.104(d)(4)(ii) for secondary research uses of identifiable private information if the information is recorded by the investigator in such a manner that the identity of the human subjects cannot readily be ascertained directly or through identifiers linked to the subjects ("De-Identified Data"), the investigator does not contact the subjects, and the investigator will not re-identify the subjects.

2. MC agrees that NKR may conduct secondary data analysis and research using De-Identified Data provided the following covenants and conditions are met:

   a. NKR has and will maintain an active FederalWide Assurance in good standing with the federal Office for Human Research Protections;

   b. NKR has and will maintain IRB policies that comply with 45 C.F.R Part 46 and will comply with such policies with respect to review, approval or exemption of NKR research, including secondary research involving De-Identified Data;

   c. NKR represents and warrants that De-Identified Data will comply with the definitions and standards for de-identification at 45 C.F.R. § 46.104(d)(4)(ii) and 45 C.F.R. §164.514(a)-(b);

   d. NKR has confirmed that the consent for treatment signed by the patients for whom it wishes to create De-Identified Data pursuant to this Section II does not contain any provisions barring secondary research use and/or that the patient has not opted out of secondary research uses;

   e. NKR shall be solely responsible for the creation and any use or disclosure of the De-Identified Data;

   f. NKR shall ensure that De-Identified Data is not re-identified and that no patients comprising the De-Identified Data are contacted;

   g. NKR shall promptly report to MC any impermissible uses or disclosures, or other failure to comply with the terms of this Section II.2."

v. Section III.2., as amended by the First Amendment, is hereby deleted in its entirety.

vi. For the avoidance of doubt, Sections III.3. and III.4. were deleted upon execution of the First Amendment.

vii. Section III.5. is hereby deleted in its entirety.

viii. Member Center acknowledges and agrees that it shall pay an annual fee of $18,000 per year pursuant Section IV.13. as an NKR member that is no longer a party to the All In Addendum.

ix. Section VI is hereby deleted in its entirety and replaced with the Business Associate Agreement as appended to this Second Amendment as <u>Exhibit B</u>.

x. Section VII, as created by the First Amendment, is hereby deleted in its entirety and replaced with the following:

**"VII. ADDITIONAL TERMS**

1. **Access to Records**: The following provision applies only to contracts for services, including contracts for goods and services, where the value or cost for services is $10,000 or more over a 12-month period. In accordance with 42 USC 1395x(v)(1)(a)(i) and the implementing regulations at 42 C.F.R. 420.302(a)&(b), during the term of this Agreement and for a period of four (4) years after the termination of this Agreement, NKR shall allow the Department of Health and Human Services ("HHS"), the Comptroller General of the United States, and their duly authorized representatives to have the right of access to this Agreement and to NKR's books, documents, and records which are necessary to verify the nature and extent of costs of services furnished by NKR under this Agreement. NKR agrees to provide a similar clause in all contracts between NKR and an organization related to the NKR relating to the performance of this Agreement, where the value or cost for such services is $10,000 or more over a 12-month period. NKR shall give Hospital notice immediately upon receipt of any request from HHS or the Comptroller General of the United States or any of their duly authorized representatives for disclosure of such information.

2. **Advertising and Promotion**: Neither Party to this Agreement shall use the name, trademark, logos or other intellectual property of the other Party or publicize the existence of this Agreement in any publicity, advertising, marketing or promotional materials without the prior written consent of the other Party.

3. **Governing Law and Venue:** This Agreement, and all matters relating to it shall be governed by and construed in accordance with the laws, rules and regulations of the State of Colorado, as are now in effect or as may be later amended or modified, without reference to the choice of law rules of Colorado or any other state. This Agreement, and all matters relating to it shall be enforced in, and all Parties do now submit to, the exclusive jurisdiction and venue of any court having subject matter jurisdiction located in the City and County

of Denver, State of Colorado, or in the United States District Court for the District of Colorado sitting in the City and County of Denver, regardless of where this Agreement may be executed. Each Party consents to and agrees to file a general appearance in such a court in the event that it receives service of process.

4. **Assignment and Subcontracting**: A Party may not assign or delegate any of its rights or obligations under this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld; provided, however, that MC may assign its rights and delegate its obligations under this Agreement at any time to MC's parent companies, affiliates, subsidiaries or any other entity controlling, controlled by or under common control with MC. NKR may not subcontract performance of its obligations or duties under this Agreement without the prior written consent of MC, which consent shall not be unreasonably withheld. NKR further agrees that NKR will cease using a subcontractor; replace a subcontractor and/or require that a subcontractor remove a subcontractor employee at MC's request. No subcontracting arrangement shall relieve NKR of its obligations hereunder should the subcontractor fail to perform in accordance with the provisions of this Agreement, and NKR shall be solely responsible for the acts or omissions of any subcontractors used by NKR in connection with this Agreement. Nothing in this Agreement shall create any contractual relationship between MC and a subcontractor used by NKR, and MC shall not have any obligation to pay any subcontractor used by NKR. MC acknowledges and consents to NKR subcontracting performance of certain information technology obligations or duties under this Agreement to HIL & CO, LLC.

5. **Attorney's Fees**: The prevailing Party in any legal action or other proceeding to enforce any provision of this Agreement shall recover from the other Party all reasonable costs and expenses, including reasonable attorney's fees, incurred by the prevailing Party in connection with such action.

6. **Binding Effect**: The provisions of this Agreement shall be binding upon and inure to the benefit of the respective lawful successors and permitted assigns of the Parties to this Agreement.

7. **Code of Conduct**: Consistent with the Office of Inspector General of the U.S. Department of Health and Human Services (OIG) initiative encouraging health care providers to engage in efforts to combat fraud and abuse in health care, and guidance from the Colorado Department of Public Health and Environment (CDPHE), MC has implemented a corporate compliance program that includes MC's Code of Conduct. The Code of Conduct can be accessed at https://www.uchealth.org/wp-content/uploads/2018/03/EMP-Code-of-Conduct.pdf. It is the policy of MC that all entities doing business

with MC follow the Code of Conduct. NKR acknowledges that it has reviewed the Code of Conduct and that NKR and its officers, directors, agents, employees and subcontractors will abide by the Code of Conduct in connection with the provision of services or products under this Agreement. NKR further agrees that neither NKR, nor its officers, directors, agents, employees or subcontractors will take any action to induce or result in a violation of the Code of Conduct.

8. **Confidentiality**:

A.     "**Confidential Information**" shall mean all technical, business, financial, and other information disclosed by the disclosing party ("**Disclosing Party**") to the receiving party ("**Receiving Party**"), whether orally or in writing or whether or not labeled as confidential. MC's Confidential Information shall also include, but not be limited to, information related to or regarding MC's patients; provided, however, that the NKR's obligations with respect to patient information that meets the definition of protected health information (as defined in 45 CFR § 160.103) ("**Protected Health Information**") shall be subject to the terms and conditions of a Business Associate Agreement that is executed between the Parties pursuant to subsection G below. The definition of Confidential Information includes, without limitation, the terms of this Agreement; all pricing information; all non-publicly available information related to the Disclosing Party; oral, written, graphic or machine-readable information, program object code or source code; business or development plans, trade secrets, business techniques, proprietary information, and know-how; and personal information about employees, clients, licensors, contractors, patients and others, that may be disclosed, whether orally or in writing, by the Disclosing Party to the Receiving Party, or that may be otherwise received or accessed by the Receiving Party in connection with this Agreement, whether transmitted prior to or after the Effective Date of this Agreement.

B.     The Receiving Party shall treat as confidential all Confidential Information it receives from the Disclosing Party and shall not use the Disclosing Party's Confidential Information except as expressly permitted under this Agreement or to the extent necessary to fulfill the Receiving Party's duties under this Agreement. The Receiving Party shall not disclose the Disclosing Party's Confidential Information to any third party without the Disclosing Party's prior written consent. The Receiving Party may disclose the Disclosing Party's Confidential Information to the Receiving Party's employees on a need-to-know basis, provided that such employees agree to keep such information confidential in accordance with the terms of this Section VII.8. Notwithstanding the foregoing, the Receiving Party shall have the right to disclose Confidential Information of the

Disclosing Party as required for tax, legal, audit or regulatory purposes provided that the Receiving Party only discloses that Confidential Information necessary to comply with such purposes and that the Receiving Party's agents, employees or contractors who receive the Confidential Information for such purposes agree to keep such information confidential in accordance with the terms of this Agreement. The Receiving Party will protect and maintain the confidentiality of the Disclosing Party's Confidential Information that is in the care, custody or control of the Receiving Party, its agents, employees or contractors, with the same care it uses to protect and maintain its own Confidential Information but in no case less than a reasonable degree of care.

C.      Notwithstanding the above, the Receiving Party shall not be required to keep information of the Disclosing Party confidential that:

(1)   was independently developed by the Receiving Party, or its agents, employees or contractors without any use of the Disclosing Party's Confidential Information;

(2)  becomes known to the Receiving Party, without restriction, from a third-party under no obligation of confidentiality that is known to the Receiving Party;

(3)  was available to the general public at the time it was disclosed or becomes available to the general public through no act or omission of the Receiving Party; or

(4)  was rightfully known to the Receiving Party, without restriction, at the time of disclosure.

D.      The Receiving Party may disclose the Disclosing Party's Confidential Information to the extent required pursuant to an order or requirement of a court, pursuant to a subpoena or other discovery process (e.g., interrogatories or requests for the production of documents), or an order of an administrative agency or other governmental body or as otherwise required by applicable law; provided, however, that the Receiving Party shall, if legally permitted, provide prompt notice thereof to the Disclosing Party so that the Disclosing Party can determine whether the Disclosing Party wants to obtain a protective order or otherwise prevent public disclosure of such information. If the Disclosing Party seeks a protective order, then the Receiving Party will provide reasonable cooperation at the Disclosing Party's request and expense.

E.      The Receiving Party acknowledges that, due to the unique nature of the Disclosing Party's Confidential Information, the Disclosing Party may not have an adequate remedy at law in the event of any unauthorized use or disclosure of the Disclosing Party's Confidential Information by the Receiving Party or the Receiving

Party's agents, employees or contractors. In addition to any other remedies that may be available in law, in equity or otherwise, the Disclosing Party shall be entitled to seek injunctive relief to prevent such unauthorized use or disclosure without having to prove irreparable injury or damages or to post a bond or other security.

F.     The Parties recognize that certain information may be proprietary even though it is not confidential. The Receiving Party agrees that it will use the Disclosing Party's proprietary information to the extent reasonably necessary for the Receiving Party to perform its obligations under this Agreement. The Receiving Party shall not otherwise use the Disclosing Party's proprietary information without the consent of the Disclosing Party or permit a third party to have access to or use the Disclosing Party's proprietary information without the prior written consent of the Disclosing Party.

G.     The Parties acknowledge and agree that the restrictions in this provision shall not apply to information provided to MC' s Group Purchasing Organization (GPO), Affiliates, or Consultants for benchmarking purposes.

H.     The terms and conditions of any Business Associate Agreement executed between the Parties shall govern the use and disclosure of Protected Health Information that NKR receives, obtains access to or is otherwise exposed to in connection with this Agreement. The terms and conditions of the Business Associate Agreement provided in Section VI shall prevail over any conflicting terms and conditions of this Agreement with respect to such Protected Health Information.

I.     Nothing in this Section VII, the Agreement, or any other MC document or agreement executed between the Parties shall preclude the lawful reporting of any alleged misconduct, including fraud, abuse or waste, to any government agency authorized to receive such information.

J.     The terms of this Section VII.8. shall survive the termination or expiration of this Agreement.

9.  **Data Security and Breach Notification**:   If NKR is providing services as a Third-Party Service Provider, as defined in C.R.S. §§ 6-1-713.5(5) and 6-1-716(1)(i), and has been contracted to maintain, store, or process Personal Identifying Information ("PII"), as defined in C.R.S. § 6-1-713.5(2)(b), and/or Personal Information ("PI"), as defined in C.R.S. § 6-1-716(1)(g), NKR agrees to (a) in accordance with C.R.S. § 6-1-713.5(2), implement and maintain reasonable security procedures and practices to protect the Personal Identifying Information disclosed to it, and/or (b) in accordance with C.R.S. § 6-1-716(2)(b), give notice of a Security Breach of Personal Information to MC's Privacy Officer at privacy@uchealth.org and cooperate with

8

any ensuing investigation of the Security Breach by MC. The provisions of this Section VII.9. shall prevail over any other provisions in this Agreement that may conflict or appear inconsistent with any provision in this Section VII.9., except to the extent the other requirements of this Agreement are more protective of PII or PI. Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits MC to comply with the all applicable Colorado laws, rules, regulations and other legal requirements related to data protection and data privacy.

10. **Counterparts/Execution by PDF**:  For the convenience of the Parties, this Agreement and any amendments, attachments, exhibits or schedules to this Agreement, may be executed in two or more counterparts.  A PDF copy of an original signature or a digital copy of an original signature is effective as if the original signature was sent to the other party.  Signature pages may be exchanged electronically. The Parties intend that counterpart copies signed and exchanged as provided in this Section VII.10. shall be fully binding as an original handwritten executed copy hereof, and all of such copies together shall constitute one instrument.

11. **Deficit Reduction Act of 2005**:  MC is required under Section 6032 of the Deficit Reduction Act of 2005 to establish a written policy and provide detailed information concerning federal and state False Claims Acts to employees, contracting parties, and agents of MC. Accordingly, the False Claims Act is discussed in the Code of Conduct on page 16.  The Code of Conduct can be accessed at https://www.uchealth.org/wp-content/uploads/2018/03/EMP-Code-of-Conduct.pdf. Specifically, the False Claims Act makes it a crime to, among other things, knowingly make a false record or file a false claim with the government in order to receive payment.

12. **Informal Dispute Resolution**:  The Parties agree that they will attempt to resolve any dispute between the Parties arising under or relating to this Agreement through informal means.  If a dispute between the Parties arises, a Party seeking to resolve the dispute shall inform the other Party in writing and provide the other Party with a description of the item(s), amount(s) and/or matter(s) in dispute. Representatives of the Parties then will use commercially reasonable efforts to resolve the dispute without the necessity of any formal proceeding.  Formal proceedings for the resolution of a dispute between the Parties, including mediation, arbitration, or legal action, may not be commenced by a Party until the earlier of the following: (i) a Party concludes that resolution through continued negotiation as required under this Section VII.12. does not appear likely; or (ii) thirty (30) days have passed since the initial request to negotiate the dispute was made.  Notwithstanding the foregoing, a Party may initiate a legal action without resorting to the informal dispute resolution required

under this Section VII.12. to avoid the potential expiration of any applicable limitations period, to preserve a superior position with respect to other creditors, or to apply for interim or equitable relief.

13. **Alternative Dispute Resolution**: MC's participation in any form of alternative dispute resolution, including, but not limited to, mediation or arbitration, shall be subject to MC's prior written consent.

14. **Entire Agreement**: This written Agreement constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement. This Agreement supersedes all prior oral or written representations, statements, agreements and understandings between the Parties with respect to the subject matter of this Agreement.

15. **Waiver**. No provision of this Agreement may be waived unless the waiver is in writing and the waiver is signed by the Party granting the waiver. No waiver of any term or condition of this Agreement shall be deemed to be a subsequent waiver of such term or condition. The waiver by a Party of a breach or default of any provision of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other provision of this Agreement. No delay or failure of a Party to this Agreement to exercise a right under this Agreement shall constitute a waiver or abandonment of that right.

16. **Federal Health Care Program Warranties**: NKR represents and warrants to MC that neither NKR, its parent company or any of their respective affiliates or subsidiaries: (a) are excluded from participation under any federal health care program, as defined under 42 U.S.C. § 1320a-7b(f) (the "**Federal Healthcare Programs**") or any state healthcare programs; (b) have been convicted of a criminal offense related to the provision of healthcare items or services but have not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal Healthcare Programs or any state healthcare programs; (c) are, to the best of NKR's knowledge, under investigation or otherwise aware of any circumstances which may result in NKR being excluded from participation in any Federal Healthcare Programs or any state healthcare programs; and (d) have been subject to or have pending against them a final adverse action, as such term is defined under 42 U.S.C. §1320a-7e(g). NKR also represents and warrants that the NKR, its parent company and any of their respective affiliates or subsidiaries will not use employees, agents or contractors who are excluded from participation under any Federal Healthcare Programs or any state healthcare programs in connection with products provided or services performed under this Agreement. The foregoing shall be ongoing representations and warranties during the term of this Agreement, and NKR shall notify MC of any breach of the foregoing representations or warranties within seven (7) days after learning of any such breach.

17. **Headings**: The captions and headings used in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

18. **Independent Contractors**: NKR is providing goods and/or performing services under this Agreement as an independent contractor and not as an employee, agent, partner, or joint venturer of or with MC. NKR does not have any express or implied authority to act as an agent for MC or to assume or create any obligation or responsibility on behalf of, or in the name of, MC. NKR shall be solely responsible for satisfying all tax and other governmentally-imposed responsibilities with regard to NKR employees, including, but not limited to, payment of social security taxes, workers' compensation, self-employment taxes, and all other applicable payroll taxes and withholdings. Neither NKR nor its agents or employees will be entitled to obtain any benefits that MC makes available to its employees, including, but not limited to medical insurance or unemployment insurance benefits. THE INDEPENDENT CONTRACTOR IS NOT ENTITLED TO WORKERS' COMPENSATION BENEFITS FROM MC. THE INDEPENDENT CONTRACTOR IS OBLIGATED TO PAY FEDERAL AND STATE INCOME TAX ON ANY MONEYS EARNED PURSUANT TO THIS CONTRACT RELATIONSHIP.

19. **Insurance**: NKR shall maintain, at NKR's sole expense, the following insurance coverage with the following minimum limits: Workers' Compensation – statutory requirement (or self-insurance to the extent permitted under Applicable Laws); Employer's Liability -- $1,000,000 per occurrence; Comprehensive General Liability -- $1,000,000 each occurrence, $2,000,000 annual aggregate; and Automobile Liability -- $1,000,000 combined single limit per accident for bodily injury); and privacy/cyber liability insurance with a minimum limit of $1,000,000 per claim. MC will be named as an additional insured on all NKR insurance policies (with the exception of Worker's Compensation and Employer's Liability). NKR shall provide a certificate of insurance evidencing such insurance upon request. Each policy shall require a minimum of thirty (30) days' prior written notice to MC prior to cancellation.

20. **Indemnification By NKR**: NKR agrees to indemnify, defend and hold MC, its parent(s), affiliates, subsidiaries and their respective officers, directors, employees, and agents (collectively, the "Indemnified Parties") harmless from any and all third party claims, liabilities, damages, obligations, judgments, causes of action, proceedings, settlements, government fines and penalties, costs and expenses, including, but not limited to, reasonable attorneys' fees (collectively, "Claims") to the extent arising out of or related to: (i) personal injury, wrongful death or property damage caused by NKR

or NKR's employees, agents, subcontractors or caused by NKR's products or services; (ii) NKR's breach of this Agreement; and/or (iii) any negligence, gross negligence, intentional or willful conduct on the part of NKR or NKR's employees, agents or subcontractors. Notwithstanding the foregoing, the Parties agree that NKR will not be responsible for indemnifying, defending or holding an Indemnified Party harmless to the extent that the Claim arises out of the acts or omissions of the Indemnified Party, its agents or employees. This terms of this Section VII.20. shall survive the termination or expiration of this Agreement.

21. **Intellectual Property Indemnification By NKR.**

    A.        NKR shall indemnify, defend, and hold the Indemnified Parties (as defined in Section 20, Indemnification by NKR, above) harmless from and against any and all Claims brought against any Indemnified Party arising out of or related to any Claims (as defined in Section 20, Indemnification by NKR, above) that all or part of the NKR's products or services or the Indemnified Parties' use of NKR's products or services misappropriates or infringes upon any patent, trademark, copyright, trade secret or other intellectual property or proprietary right of any third party.  If all or part of NKR's products or services or MC's use thereof are held to infringe upon or misappropriate any patent, trademark, copyright, trade secret or other intellectual property or proprietary right of any third party, and MC's use of NKR's products or services, or any part thereof, is enjoined or interfered with in any manner, then NKR shall, at NKR's sole expense and within thirty (30) calendar days of such injunction or interference, either, at MC's option: (i) procure for MC the right to continue using such products or services free of any liability for misappropriation or infringement; or (ii) replace or modify such products or services with a non-infringing and non-misappropriating product or service of equivalent or better functionality that is reasonably satisfactory to MC.  If NKR is unable, after exercising its best efforts, to implement option (i) or (ii) above, then NKR will remove the infringing product or cease providing the infringing service and refund amounts paid by MC for such product or service.

    B.        The terms of this Section VII.21. will survive termination or expiration of this Agreement.

22. **Indemnification Procedure**.  MC shall promptly notify NKR in writing of any action, claim or other matter in respect of which an Indemnified Party intends to claim indemnification under Section VII.20., Indemnification by NKR, and/or Section VII.21., Intellectual Property Indemnification By NKR; provided, however, the failure to provide such notice within a reasonable period of time shall not relieve NKR of any of its indemnification obligations hereunder except to the extent that NKR is prejudiced by such failure.  MC will have the right

to approve the counsel selected by NKR, which approval shall not be unreasonably withheld. MC shall permit, and shall cause its directors, officers, employees and agents to permit the NKR, at the NKR's discretion, to settle any such action, claim or other matter, subject to the provisions of the next sentence. MC agrees to the complete control of such defense or settlement by NKR subject to the following exceptions: any admission of liability on the part of an Indemnified Party or any obligation of payment by an Indemnified Party shall be subject to the prior written approval of MC and any continuing obligations, covenants or representations of MC shall be subject to the prior written approval of MC. MC and its directors, officers, employees and agents shall cooperate fully with the NKR and its legal representatives in the investigation and defense of any action, claim or other matter covered by NKR's indemnification obligations under this Agreement. MC shall have the right, but not the obligation, to be represented by counsel of its own selection and at its own expense. This terms of this Section VII.22. shall survive termination or expiration of this Agreement.

23. **MC Indemnification**. MC is a political subdivision of the State of Colorado, and, as such, cannot contractually agree to provide indemnification.

24. **Colorado Governmental Immunity Act**: University of Colorado Hospital Authority is a body corporate and political subdivision of the State of Colorado, and as such, is subject to the Colorado Governmental Immunity Act ("CGIA"), C.R.S. §24-10-101, *et.seq.*, which includes provisions limiting MC's liability in any action that lies in tort or could lie in tort. Notwithstanding any other provision of this Agreement to the contrary, no term or condition of this Agreement (including, but not limited to, any provision that directly or indirectly attempts to make MC liable for acts or omissions of any person other than its public employees, as described in the CGIA) shall be construed or interpreted as a waiver, either express or implied, of any of the immunities, rights, benefits or protections provided to MC under the CGIA. The Parties acknowledge and agree that all other provisions of this Agreement are subject to, and qualified and limited by, the CGIA.

25. **Limitation on Consequential Damages**: In no event shall a Party be liable under this Agreement to the other Party for any indirect, incidental, consequential, special, exemplary, or punitive loss or damages in connection with this Agreement regardless of (A) whether such damages were foreseeable; (B) whether or not the other Party was advised of the possibility of such damages; and (C) the legal or equitable theory (contract, tort or otherwise) upon which the claim is based. This Section VII.25. will not apply to the following: a Party's indemnification obligations under this Agreement; damages arising

out of the fraud, misrepresentation or willful misconduct of a party, its agents or employees; a breach of confidentiality; or an improper disclosure of Protected Health Information; or a termination of this Agreement by MC in accordance with Section VII.31., No Employment of Undocumented Immigrants to Perform Work under this Agreement, below.

26. **Credit Memos and Rebate Checks:** All credit memos and rebate checks will be mailed to MC's accounts payable department, not the supply chain or department staff. Copies of the credit memos and checks with expense details must be delivered to the appropriate party in the supply chain for processing.

27. **Legal Authority**: The person signing and executing this Agreement on behalf of a Party hereby warrants and represents that he/she has been fully authorized by such Party to execute this Agreement on behalf of such Party and to validly and legally bind such Party to all terms, performances and provisions set forth in this Agreement.

28. **Unlawful Discrimination**: Neither Party will discriminate in any unlawful manner. **The Parties shall abide by the requirements of 41 CFR §§ 60-1.4(a), 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, and prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity or national origin. Moreover, these regulations require that the parties take affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, national origin, sexual orientation, gender identity, protected veteran status or disability.**

29. **No Third Party Beneficiary**: This Agreement is entered into solely for the benefit of the named Parties to this Agreement and their respective successors and permitted assigns. Nothing in this Agreement shall be construed to create any duty, liability, or benefit to or for any person or entity that is not a party to this Agreement.

30. **Notice**: Any notice provided pursuant to the terms and provisions must be in writing and delivered: (i) by hand/personal delivery; or (ii) by United States Mail (in a properly stamped envelope, via certified or registered mail, return receipt requested) or national overnight courier service, property addressed to the Party to whom it is to be given and the address herein after set forth. Any notice shall be deemed to have been given on (i) the day such notice or communication is hand/personally delivered, (ii) three (3) days after such notice or communication is mailed by prepaid certified or registered mail, or (iii) one (1) day after such notice or communication is sent by overnight courier. A Party may change the address for

notices by notifying the other Party in writing.  Notices will be sent to:

| | |
|---|---|
| If to NKR: | 42 Fire Island Avenue<br>Babylon, NY 11702<br>Attn:  [          ] |
| If to MC: | 12401 E. 17th Avenue, Mail Stop F-448<br>Aurora, CO 80045<br>Attn:  Barbara Carveth |
| With a copy to: | University of Colorado Health<br>Attn: Legal Department<br>12401 E. 17th Avenue, Mail Stop F-415<br>Aurora, CO 80045 |

31. **No Employment of Undocumented Immigrants to Perform Work under this Agreement:**

A. NKR understands that, by having an agreement with University of Colorado Hospital Authority, a body corporate and political subdivision of the state of Colorado, this Agreement may be a Public Contract for Services, as defined by CRS §8-17.5-101(6). For the purpose of this Section VII.31., the term "undocumented immigrant" shall have the same meaning as the term "illegal alien" as used in CRS § 8-17.5-102.

B. The NKR also agrees and represents that:

(1) It shall not knowingly employ or contract with an undocumented immigrant to perform work under this Agreement.

(2) It shall not enter into a contract with a subcontractor that fails to certify to the NKR that the subcontractor shall not knowingly employ or contract with an undocumented immigrant to perform work under this Agreement.

(3) **Newly Hired for Employment E-Verify or Colorado Department Program Requirement:** It has confirmed the employment eligibility of all employees who are newly hired for employment to perform work under this Agreement, through participation in the E-Verify Program **or Colorado Department Program**, as defined by CRS 8-17.5-101(3.7).  NKR will confirm such employment eligibility for each NKR employee prior to the date such employee begins to provide services under this Agreement.

(4) **No Pre-Employment E-Verify or Colorado Department Program Screening:** NKR is prohibited from using the E-Verify

15

Program **or Colorado Department Program** procedures to undertake pre-employment screening of job applicants while performing its obligations under this Agreement.

(5) If NKR obtains actual knowledge that a subcontractor performing work under this Agreement knowingly employs or contracts with an undocumented immigrant, then NKR will notify such subcontractor and MC within three (3) days after the NKR has actual knowledge that the subcontractor is employing or contracting with an undocumented immigrant. The NKR will also then terminate the subcontract with such subcontractor if, within three (3) days after the subcontractor receives notice from NKR, the subcontractor does not stop employing or contracting with the undocumented immigrant, except that the NKR shall not terminate the contract with the subcontractor if during such three-day period the subcontractor provides information to establish that the subcontractor has not knowingly employed or contracted with an undocumented immigrant.

(6) It will comply with any reasonable request made in the course of an investigation by the Colorado Department of Labor and Employment.

C.       MC may terminate this Agreement for breach of contract if NKR violates this Section VII.31.  If this Agreement is so terminated, then NKR shall be liable for actual and consequential damages to MC.

32. **Payment Terms**:

A.       Invoices will be paid within forty-five (45) days of the invoice date.  No penalty fees or interest will be applied for late payments.

B.       Any price increases must be mutually agreed upon, in advance, by the Parties in writing.

C.       MC may pay suppliers electronically with a VISA commercial card using an email based process. Vendors shall agree to accept payment via credit card if requested by MC.

33. **Severability**:   In the event any provision of this Agreement is rendered invalid or unenforceable by law, or declared void by any court of any competent jurisdiction, the court shall reform the invalid or unenforceable provisions to the extent reasonably possible or sever it from this Agreement and the remainder of the provisions of this Agreement shall remain in full force and effect.

34. **Taxes**: MC warrants and NKR acknowledges that MC is exempt from tax obligations either by virtue of 501(c)(3) status and/or as a political subdivision of the State of Colorado.  MC's State of Colorado Tax exempt number is 98-09003-0000 (1998).  MC's Federal ID number is 84-1179794.  NKR shall not charge or require MC to pay any taxes

in connection with products or services provided by NKR in connection with this Agreement.

35. **Termination**:

A.     Termination for Convenience.  Consistent with Section 3.b. of the Service Contract, MC may terminate this Agreement, including these Member Center Terms and Conditions, without cause upon thirty (30) days' prior written notice to NKR.

B.     Termination for Cause**.**  Either Party may terminate this Agreement for cause at any time upon thirty (30) days' prior written notice to the other Party subject to the other Party's right to cure prior to the end of the thirty (30) day notice period.  This Agreement shall terminate at the end of the thirty (30) day notice period unless the breaching Party is able to cure the breach to the reasonable satisfaction of the terminating Party prior to the end of the thirty (30) day notice period.  The terminating Party may, at the terminating Party's sole discretion, extend the time period for the breaching Party to cure the breach.

C.     Modification or Termination Upon Advice of Counsel**.**  Notwithstanding the foregoing, if at any time MC believes in good faith based on the advice of counsel that this Agreement or a Party's performance of its obligations under this Agreement violates any Applicable Laws; presents a substantial risk of the loss or restriction of MCs' license, tax exemption, or right to participate in Medicare, Medicaid or any other governmental program; or presents a substantial risk of causing debt issued by MC that was tax-exempt when originally issued to become subject to federal or state income tax, then MC may, upon written notice to NKR, require NKR to enter into good faith negotiations to renegotiate the terms of this Agreement in a manner that attempts to retain as much as possible of the economic arrangements originally contemplated by the Parties without violating any Applicable Laws.  If the Parties are unable to reach an agreement concerning the modification of this Agreement within sixty (60) days after the date of the notice seeking renegotiation (or sooner if required by law), then MC may immediately terminate this Agreement upon written notice to NKR.

D.     Termination Due to Bankruptcy.  In the event that a Party files for protection under bankruptcy laws, makes an assignment for the benefit of creditors, appoints or suffers appointment of a receiver or trustee over its property, files a petition under any bankruptcy or insolvency act or has any such petition filed against it which is not discharged within sixty (60) days of the filing thereof, then the other Party may terminate this Agreement effective immediately upon written notice to the bankrupt Party.

36. **Effect of Termination.** Upon termination, all rights and obligations under this Agreement will end (except for unpaid amounts due for products provided or services rendered prior to termination or expiration; any provisions that expressly state that they survive termination or expiration; or any right or obligation which by its nature should survive termination or expiration of this Agreement). The Parties agree that upon such termination, any fees, costs or expenses that have been prepaid by MC for services or products to be supplied after the date of termination, will be promptly refunded to MC.

37. **Compliance With Applicable Laws; Licenses**. NKR shall comply with all applicable federal, state, and local laws, rules, regulations, ordinances and other legal requirements (collectively, "Applicable Laws"). NKR represents and warrants that NKR has all licenses and permits required by Applicable Laws to perform its obligations under this Agreement.

38. **Compliance With Regulatory Standards and MC Policies**. NKR shall comply with all standards promulgated by The Joint Commission or other accrediting organizations that are applicable to the Products or services provided by NKR to MC. NKR shall also comply with all applicable MC policies and procedures, including, but not limited to, vendor credentialing requirements; MC policies and procedures governing vendor conduct at MC's facilities; and pre-employment and on-going physicals, background checks and testing for NKR personnel who will be performing on-site services. NKR agrees to pay any and all applicable fees MC charges for services provided by MC in connection with the foregoing.

39. **Force Majeure**:

    A.     The term "Force Majeure" shall mean any government requirement or request; war; public disorders; acts of enemies; terrorism; sabotage; strikes; lockouts; picketing; protected, concerted labor activity; fires; floods, earthquakes, hurricanes, natural disasters or other acts of God; pandemics or epidemics; or any other cause beyond the reasonable control of a Party.

    B.     A Party shall not have any liability for beach of this Agreement if the Party's performance under this Agreement is prevented by a Force Majeure event. Instead, a Party whose performance is affected by the Force Majeure event shall be excused from performance of its obligation for so long as, and only to the extent that, the non-performance of the obligation is due to the Force Majeure event. If a Force Majeure event precludes NKR from performing, then MC will have the right to obtain Products or services from another third-party vendor during the period of time that the Force Majeure event precludes NKR's performance under this

Agreement. If NKR's inability to perform continues for more than thirty (30) days, then MC will have the right to terminate this Agreement without cause upon five (5) days' prior written notice to the NKR. NKR agrees that it will undertake commercially reasonable efforts to re-commence performance as soon as practical after the Force Majeure event occurs.

40. **Audit**: NKR shall maintain accurate books and records in connection with its provision of products and/or services under this Agreement. Subject to Section VII.1., Access to Records, NKR shall retain such books and records for a period of at least one (1) year following termination or expiration of this Agreement. NKR will make such books and records available to MC or MC's designee for auditing purposes, including, but not limited to, the following: (i) to confirm that NKR's charges to MC are consistent with the terms of this Agreement; (ii) to confirm that NKR is complying with NKR's duties and obligations under this Agreement; and/or (iii) to permit MC to otherwise enforce or implement the terms of this Agreement. MC will be responsible for the cost of any audits conducted by MC. MC agrees to provide at least five (5) business days' notice of any request to audit NKR's books and records. MC shall conduct such audits during normal business hours at a location to be mutually agreed upon by the parties. The terms of this Section VII.40. shall survive termination or expiration of this Agreement.

41. **Cumulative Remedies**: The remedies provided hereunder are cumulative and not exclusive of any other remedies available at law or in equity.

42. **WAIVER OF RIGHT TO TRIAL BY JURY**: EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO DEMAND THAT ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR THE RELATIONSHIP OF THE PARTIES HERETO BE TRIED BY JURY. EACH PARTY HERETO ACKNOWLEDGES THAT IT IS KNOWINGLY AND VOLUNTARILY WAIVING ITS RIGHT TO DEMAND TRIAL BY JURY.

43. **MC Data**:

A. "MC Data" means any data, materials or information (regardless of form, medium or source from which derived) provided or made available to NKR in connection with this Agreement, including, but not limited to, data, materials or information relating to MC or its affiliates, subsidiaries, parent entities or related parties that is available through the use of information technology systems, databases or software used by or on behalf of MC or by or on behalf of NKR. MC Data includes, but is not limited to, MC Confidential

Information, Protected Health Information ("PHI") (as that term is defined in 45 CFR § 160.103) and any PHI that has been aggregated or de-identified.

B.       As between MC and NKR, MC shall own all MC Data. NKR shall only use MC Data to the extent necessary for NKR to perform its duties and obligations under this Agreement.  NKR shall not provide MC Data to a third party without MC's prior written consent.

C.       NKR shall return or destroy all MC Data upon expiration or termination of this Agreement unless otherwise mutually agreed upon by the Parties in writing.  Where applicable, NKR shall accomplish the destruction of MC Data by "purging" or "physical destruction", in accordance with the National Institute of Standards, Guidelines for Media Sanitization, SP800-88, Appendix A - see http://csrc.nist.gov/.

D.       Any MC Data that is stored by NKR electronically will be stored in an encrypted form using a commercially supported encryption solution.   Encryption solutions will be deployed in accordance with industry best practices, with no less than a 128-bit key for symmetric encryption and no less than a 1024-bit key length for asymmetric encryption.

E.  NKR agrees that the duties and obligations under this Section VII.43. that apply to PHI and/or PHI that has been aggregated or de-identified (referred to collectively as **"Patient Data"**), are in addition to any obligations under the Business Associate Agreement (**"BAA"**) entered into by NKR and MC.  In the event of any conflict between this Section VII.43. as it applies to Patient Data and the BAA, then the BAA shall control.

44. **Offshoring**:  NKR and any authorized subcontractors of NKR shall not perform services under this Agreement outside of the United States without the express written consent of MC.  To the extent that offshore arrangements are permitted and used this Agreement, NKR hereby warrants and represents: (a) NKR has policies and procedures in place for offshore subcontractors to ensure that HIPAA PHI and other personal information remains secure; (b) NKR has offshore subcontracts in place that allow for immediate termination of the subcontract upon discovery of a significant security breach; and (c) NKR will, at MC's request, conduct an annual audit of each offshore subcontractor providing services under this Agreement to ensure HIPAA compliance, which audit results will be shared with MC.  Offshore for purposes of this Agreement refers to any country that is not one of the fifty United States or a territory of the United States. NKR shall comply with applicable international laws regarding privacy and security of data within the definition of MC's

Confidential Information, including, without limitation, the General Data Protection Regulation ("**GDPR**").

45. **Key Performance Indicators**: In accordance with Joint Commission and Centers for Medicare and Medicaid Services regulatory requirements for contract services, NKR will be evaluated by MC on an annual basis on a scale of 1-5 based on the following Key Performance Indicators ("KPIs"):

The service delivery standards in the contract specification are being met or exceeded;

Service delivery times, where stated, are being met or exceeded;

MC is satisfied with the NKR's service; and

NKR complies with the policies and procedures of MC and University of Colorado Health ("UCHealth").

The Parties acknowledge and agree that the failure of NKR to favorably comply (meaning an average score of 3 or higher) with the KPIs above will be considered a material breach of the Agreement. In the event that, (i) NKR's performance does not favorably comply after an evaluation, and (ii) does not move within favorable compliance within three (3) months of the unfavorable evaluation and such favorable compliance is not maintained for a minimum of six (6) consecutive months, then MC may terminate the Agreement upon written notice to NKR, without additional payment or penalty."

5.     Miscellaneous.

(a)     Effect of Amendment.  This Second Amendment shall be a binding agreement upon the Parties.  Except as expressly or by necessary implication amended in Section 3 or Section 4 of this Second Amendment, the Service Contract and Member Center Terms and Conditions, each as amended by the First Amendment, shall remain in full force and effect.

(b)     Entire Agreement.  This Second Amendment constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements, whether written or oral, of the Parties relating to that same subject matter.

**[SIGNATURES ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, the Parties have set their hands and seals as of the Second Amendment Effective Date.

**KIDNEYLIFE FOUNDATION, INC. D/B/A NATIONAL KIDNEY REGISTRY**

By: _____

Name:

Its:


**UNIVERSITY OF COLORADO HOSPITAL AUTHORITY**

By: _____

Name:

Its:

# Member Center Terms & Conditions

Revised 11/20/20

I. **GENERAL**

1. The Member Center (MC) wishes to enroll participants into the National Kidney Registry (NKR) program so the NKR can facilitate kidney transplants and provide logistic and lab services as needed.

2. MCs agree to abide by the following Terms & Conditions, all Member Center Requirements (MCRs) and all Medical Board Policies as posted on the NKR web site.

3. MCs shall not have net chains started (NCS) less than 0. The fee for MCs with a negative NCS shall be billed on a 1:1 ratio according to the MC's NCS. For example, a center with a -2 NCS will be billed $2,000/ month, a center with a -20 NCS will be billed $20,000/ month, etc. This provision and the related monthly fee shall survive the termination of the Service Contract. The following are exceptions to this NCS requirement:

    A. The MC is a Partner Center in good standing.

    B. The MC has cumulative unredeemed Family Voucher chain starts greater than the absolute value of the MC's NCS score.

        i. Example A: if the MC has cumulative unredeemed Family Voucher chain starts of 2 and an NCS score of -2, there is no fee for the negative NCS score.

        ii. Example B: if the MC has cumulative unredeemed Family Voucher chain starts of 3 and an NCS score of -4, the monthly fee for the negative NCS score would be $1,000/ month.

3. Partner Centers have been designated to absorb the chain end kidneys resulting from the Voucher Program and deliver living donor kidneys when voucher recipients return for transplants. PCs are not subject to the NCS fees outlined in #3 above. PCs must be approved by the NKR and the NKR reserves the right to revoke PC status at any time. Requirements to become a PC include:

    A. PCs shall use best efforts to coordinate with NKR MCs to adhere to the spirit of the voucher program, by delivering living donor kidneys to voucher recipients when they return for transplants. In the event that the NKR becomes insolvent and/or ceases operations, PCs shall continue to use best efforts to coordinate with NKR MCs to adhere to the spirit of the voucher program, by delivering living donor kidneys to voucher recipients when they return for transplants. These obligations are vital so that voucher donors and recipients are not irreparably harmed. These obligations are irrevocable, exists in perpetuity, and shall survive the termination of this agreement.

    B. PCs shall be active voucher participants (i.e. offering the voucher option to appropriate donor-recipient candidates).

    C. PCs shall be active NKR Paired Exchange Program participants (i.e. 10% of the PCs living donor transplants shall be NKR Paired Exchange transplants unless there is an exceptional circumstance communicated to the NKR in writing).

    D. PCs shall execute the "All In" addendum and be in compliance with said addendum.

    E. PCs shall accept any waitlist patient offer (within reason) from the NKR. (e.g. donor age > 65, AB blood types, complex anatomy, etc.)

    F. PCs shall notify the NKR in writing within 15 days if there is a change in the kidney transplant Surgical Director.

4. "All In" MCs shall enter all KPD pairs and Non-Directed Donors (NDDs) into the NKR. KPD Pairs and NDDs must be exportable for at least two weeks before they can be removed for non-NKR exchanges, unless there is a special condition that precludes participation. Special conditions must be communicated via email to the NKR so that the NKR can consider ways to overcome, if possible, such special conditions.

5. Donor Care Network (DCN) Centers of Excellence (COE) have been selected to join the DCN and agree to follow all required commitments and offer all programs listed on the DCN website. COEs who are unable to support any of the DCN commitments or programs must provide written notification in advance describing the DCN commitments or programs that cannot be supported. COEs must be approved by the NKR and the NKR reserves the right to revoke COE status at any time.
6. Centers participating in the "Kidney for Life" (KFL) Program must adhere to the Commitments on the KFL site.
7. NKR will provide advanced written notice of any material change to the Member Center Terms and Conditions.

## II. INSTITUTIONAL REVIEW BOARD EXEMPTION

1. The MC acknowledges that the National Research Act of 1974 as governed by Title 45 of the Code of Federal Regulations, Part 46 permits an exemption to Institutional Review Board approval for research involving the collection or study of existing data, documents, records, pathological specimens, or diagnostic specimens, if these sources are publicly available or if the information is recorded by the investigator in such a manner that subjects cannot be identified, directly or through identifiers linked to the subjects.
2. NKR may conduct data analysis and research using information that is recorded by the investigator in such a manner that subjects cannot be identified, without seeking Institutional Review Board approval.

## III. INDEMNIFICATION AND WARRANTIES

1. The MC acknowledges that NKR is not a health care provider, and is not responsible for any evaluation of the health of any donor or recipient, choice of treatment, or medical services rendered. NKR does not provide any medical services, nor does it endorse any particular health care provider or procedure.
2. The Parties agree to indemnify and hold harmless, each other, as well as the Parties' subsidiaries, affiliates, officers, board of directors, agents, partners, licensors, employees, successors, and assigns, from and against any claim or demand arising from this Agreement, services provided by NKR, or any actions taken by NKR on behalf of participants, including any damages, judgment, settlement costs, litigation costs, and attorneys' fees, fines and penalties of any kind.
3. The MC warrants that NKR shall not be liable for damages of any kind, including, but not limited to, personal injuries, wrongful death, patient complications, economic losses, incidental or consequential damages, or any other such damages.
4. The MC warrants that if NKR is named as a defendant in any legal action based on MC provided medical or surgical services, the MC will pay for NKRs legal defense and make best efforts to remove NKR as a defendant from said legal action.
5. The MC agrees to indemnify NKR against any lawsuit pertaining to a donor or recipient who was not fully informed of the NKR protections they would lose by not participating in an NKR swap and participated in a swap organized by another entity that does not provide the NKR protections. Donor protections include, but are not limited to, prioritization for a living donor kidney, disability insurance, life insurance, coverage for uncovered complication costs, legal support, etc.. Recipient benefits include, but are not limited to, the 90 Day Replacement Policy.

## IV. STANDARD REIMBURSEMENTS

| 1. Transplant Services | | Database Management & Technology Support | Logistics support | Research support | CT Scan Network | Medicaid Out of State Physician Reimbursement | Donor Shield[1] |
|---|---|---|---|---|---|---|---|
| a) | Transplants | $4,312/ TXP | $2,932/ TXP | $464/ TXP | $328/ TXP | $246/ TXP | $895/ TXP |
| b) | Favorable blood type compatible pairs | $0/ TXP | $0/ TXP | $0/ TXP | $0/ TXP | $0/ TXP | $895/ TXP |
| c) | Waitlist TXPs excluding centers <0 NCS | $0/ TXP | $0/ TXP | $0/ TXP | $0/ TXP | $0/ TXP | $895/ TXP |
| d) | Remote Direct Donation | $796/ TXP | $2,932/ TXP | $25/ TXP | $328/ TXP | $246/ TXP | $895/ TXP |
| d) | Compatible pair with low alloimmune risk directed donor | $796/ TXP | $250/ TXP | $25/ TXP | $0/ TXP | $0/ TXP | $895/ TXP |

| | |
|---|---|
| 2. Donor Shield Direct[1] | Quote |
| 3. Kidney shipping | |
|    a) Ground shipment < 400 miles | $2,450 per shipment |
|    b) Commercial air + ground shipment < 400 miles | $2,450 per shipment |
|    c) Onboard courier + commercial air + ground shipment < 400 miles | $6,300 per shipment |
|    d) Charter Aircraft + commercial air and/or ground shipment <400 miles | Quote |
| 4. Database Management & Technology Support: Center Connectivity | |
|    a) Within the routine MCRs | $275/ month |
|    b) Outside of the routine MCRs | ($1,000 - $4,000 per event) |
| 5. Database Management & Technology Support: Automated Donor Intake (DASH) | |

| Prior Year LD Transplants | <25 | 25-49 | 50-74 | 75-99 | >99 |
|---|---|---|---|---|---|
| *$1,000/ month discount for centers fully utilizing follow-up module* | $1,000/ month | $2,000/ month | $3,000/ month | $4,000/ month | $5,000/ month |

| | |
|---|---|
| 6. Donor Organ Packaging | $1,576/ shipped kidney |
| 7. Donor Testing | |
|    a) Pre-Work Up Labs using Cystatin C or 24-hour urine jug | $243/ request |
|    b) 24 Hour Urine Jug Only | $28/ request |
| 8. Tissue Typing & Blood Processing | |
|    a) Donor 3G HLA, ABO, A2 and cryopreservation *(billed to donor center)* | $695/ request |
|    b) Overnight shipment of donor cryo cells for cross matching | $919/ request |
|    c) Recipient 3G HLA, ABO ($950 with kit fulfillment and phlebotomy service) | $655/ request |
| 9. Final XM Kit | $200/ Request |
| 10. Streamlined Billing Service (SBS): NKR will act as the billing agent on behalf of the Donor Center for the center shipping a kidney to, and receiving a kidney from, the SBS center. NKR will reimburse the Donor Center for the SBS costs, once collected. | |
|    a) Physician fees for donor nephrectomy | $4,221/ TXP |
|    b) Physician fees for anesthesiology | $2,252/ TXP |
|    c) Hospital Nephrectomy | $20,259/ TXP |
| 11. Donor Work Up (Standard Tests including CT) | $12,200/ workup |
| 12. Donor Protection for centers without an executed Donor Protection Addendum | |
|    a) Medicare is primary or secondary | $133/ TXP |
|    b) Medicare is not primary or secondary | $1,326/ TXP |
| 13. NKR Center annual membership | |
|    a) With Signed "All In" Addendum | $0 |
|    b) No Signed "All In" Addendum | $18,000/ year, 20% |

---

[1] Includes $250 / Database MGT & $25 Donor Protection Fund Contribution

**14. Pre-Op Serology testing**

| | | | | | |
|---|---|---|---|---|---|
| a) | COVID IgG & IgM | $150/ request | l) | HIV/HCV/HBV NAT | $253/ request |
| b) | CMV IgG | $65/ request | m) | HTLV I & II Ab | $33/ request |
| c) | CMV IgM | $68/ request | n) | HTLV PCR | $448/ request |
| d) | EBV IgM | $28/ request | o) | Syphilis/ RPR | $47/ request |
| e) | EBV IgG | $28/ request | p) | Strongyloides | $190/ request |
| f) | HBc Total Ab | $23/ request | q) | T. cruzi Ab/Chagas | $142/ request |
| g) | HBs Ab | $55/ request | r) | West Nile Virus NAT | $166/ request |
| h) | HBs Ag | $56/ request | s) | West Nile Virus WNV IGM | $82/ request |
| i) | HCV Ab | $32/ request | t) | Toxo IgG | $150/ request |
| j) | HIV 1 & 2 Ab | $30/ request | u) | CMV PCR-Quant | $98/ request |
| k) | HSV 1-2 PCR | $450/ request | v) | EBV PCR-Quant | $98/ request |

**15. Fulfillment**

| Available to | Application | Outbound fulfillment & Shipping | Return Shipping | Kit | Home Phlebotomy Service | TOTAL |
|---|---|---|---|---|---|---|
| All | COVID IgG & IgM | $84 | $72 | $44 | $95 | $295 / request |
| All | Custom Draw | $84 | $72 | $44 | $95 | $295 / request |
| Donor | HLA, ABO, A2, & Cryopreservation | $84 | $72 | $44 | $95 | $295 / request |
| Donor | Serology (inc Covid IgG & IgM) | $84 | $72 | $44 | $95 | $295 / request |
| Donor | Final XM | $84 | $72 | $44 | $95 | $295 / request |
| Recipient | 3G HLA, ABO | $84 | $72 | $44 | $95 | $295 / Request |
| Donor | Follow-Ups | TBD | TBD | TBD | $95 | $TBD / request |

**16. COVID PCR Testing**

| | |
|---|---|
| a) Test Kits | $300/ box of 10 tests |
| b) Standard Test (12-18-hour turnaround from receipt at lab) | $250 / request |
| c) STAT A Test (6-hour turnaround from receipt at lab) | $1,800 / request |
|    i) Includes direct commercial flight and 150 miles of ground transportation | |
|    ii) Additional cost for charter, connector flights and ground transport > 150 miles | Quote |
| d) STAT B Test (6-hour turnaround from receipt at lab) | $500 / request |
| e) Research (48-hour turnaround from receipt at lab) | $90 / request |

**17. COVID Antibody Testing**

| | |
|---|---|
| a) Standard (48-hour turnaround from receipt at lab) | $150 / request |
| b) Research (96-hour turnaround from receipt at lab) | $75 / request |
| **18. Microsite Mailing** | Quote |
| **19. Net Terms** | 15 Days |

## V. CENTER TO CENTER AGREEMENT

1. **Agreement:** Donor Centers (providing donor workup and/or nephrectomy) and Recipient Centers (performing recipient transplant) agree to the following:
2. **General**: In all cases the donor shall not be billed for transplant related medical services including donation evaluation, in-patient stay for donation and post donation complications per Medicare guidelines. If your center is not subject to the SBS then all claims must be submitted to the Recipient Center within 120 days from the last day of service. Acknowledgement is due upon receipt of claims. Claims payment is due as soon as possible and no later than 90 days from the receipt of an accurate claim.
3. **Voucher Program Obligations:** All NKR Member Centers and Partner Centers agree to work with each other in good faith under the leadership of the NKR Surgical Director, should the NKR ever become insolvent and/or cease operations, to provide kidneys for Voucher recipients. This obligation is irrevocable, exists in perpetuity, and survives the termination of this contract.
4. **Regulatory Compliance**: This agreement shall serve as written evidence of the required agreement between the Donor Center and Recipient Center outlining the scope of services and the process to:
   A. Review the policies and procedures related to donor evaluation, donor selection, informed consent, and multidisciplinary donor management throughout all phases of donation.
   B. Monitor and evaluate these services.
   C. Additionally, the Donor Center and Recipient Center agree to:
      i. Utilize the NKR standard swap checklists posted on the NKR web site to further ensure regulatory compliance.
      ii. Enter swap process issues into the NKR system where appropriate.
      iii. Immediately communicate to NKR if the MC is no longer in good standing.
      iv. Donor Center shall provide the Recipient Center with copies of living donor medical records up to the point of donation.
5. **Pre-Transplant Donor Evaluation Services**: The costs associated with the donor evaluation become acquisition costs of the original intended recipient's center (i.e. Donor Center). This is true of hospital pre-transplant evaluation costs as well as physician pre-transplant evaluation costs.
   A. In a KPD exchange, once the donor is matched with a recipient, any additional tests (Documented in writing by Recipient Center to donor center) requested above and beyond the evaluation tests already performed by the Donor Center to approve that donor should be billed to the Recipient Center requesting the additional tests.
   B. In the above scenario, if the swap fails and the donor does not donate to the recipient and is matched with another recipient at a second (different) Recipient Center, should the second Recipient Center request additional tests (Documented in writing by recipient center to donor center), the related charges should be billed to the second Recipient Center.
   C. Consistent with sections A & B of the above, if a Donor Center utilizes the streamlined serology testing service provided by the NKR, the Recipient Center agrees to reimburse NKR for the serology tests requested by the Recipient Center.
   D. Consistent with sections A & B of the above, if a Donor Center utilizes the donor blood cryopreservation service provided by the NKR, the Recipient Center agrees to reimburse the NKR for the donor blood cryopreservation service requested by the Recipient Center.
   E. If a donor is worked up at a hospital other than the one which they will be donating, the hospital performing the work up shall be reimbursed by the donor center via the NKR according to the Standard Reimbursements for Donor Work Up.
6. **Recipient Inpatient Services**: The Recipient Center shall bill for services as customary by submitting claims to the recipient's insurance. The physicians shall bill the recipient's insurance for services rendered.

7. **Physician Donor Nephrectomy**: Physicians shall bill for the Donor Nephrectomy as follows:
   A. If a Member Center is subject to the SBS then the Donor Center shall be reimbursed by the Recipient Center via the NKR according to the Standard Reimbursements for the SBS line items unless these costs can be billed to Medicare under CMS guidelines.
   B. If a Member Center is not subject to SBS and:
      i. Medicare is primary, then the donor physicians shall bill Medicare utilizing the recipient's Medicare number.
      ii. Medicaid or Medic-Cal is primary, then NKR shall reimburse the out of state physician fees. The reimbursement rate for the donor surgeon is $2,060 and the rate for the anesthesiologist is $1,030.
      iii. Private insurance is primary and there is a global arrangement, then the donor surgeon services shall be billed to the Recipient Center at 150% of donor center Medicare participating, and the donor anesthesiologist services shall be billed to the Recipient Center at $65.29/ASA unit.
      iv. Private insurance is primary and there is no global arrangement, then Recipient Center shall make the necessary information available prior to surgery so that the donor physicians can bill the Recipient's insurance directly. If the recipient center does not make the necessary information available, then the donor physician services shall be billed to the Recipient Center at 150% of donor center Medicare participating, and the donor anesthesiologist services shall be billed to the Recipient Center at $65.29/ASA unit.
8. **Hospital Donor Nephrectomy**:
   A. If a Member Center is subject to the SBS then the Donor Center shall be reimbursed by the Recipient Center via the NKR according the Standard Reimbursements for the SBS line items.
   B. If a center is not subject to the SBS the Donor Center shall bill the Recipient Center for the donor organ recovery cost by providing a copy of their most recently filed Medicare Cost Report, Worksheet D-4, Part I, which documents the cost per day and the appropriate cost to charge ratios along with a worksheet that reduces the Donor Center bill from charges to cost. (sample worksheet)
9. **Donor Complications**: Donor Complications (that arise after the donor nephrectomy that are a direct result of the surgery) shall be billed as follows:
   A. If Medicare is primary follow CMS guidelines.
   B. If Medicare is not primary,
      i. If there is a global arrangement then donor complications shall be billed to the Recipient Center until global end date.
      ii. If there is no global arrangement then the Donor Center shall work with the Recipient Center for reimbursement.
   C. Member Centers that have an executed Donor Protection Addendum on file with the NKR agree to pay for all Uncovered Complications (Donor Complications that are not reimbursable by the recipient insurance, recipient center or recipient) for all donors that undergo donor surgery at the Member Center's Hospital.
   D. Member Centers that do not have an executed Donor Protection Addendum on file with the NKR will be billed according to the Standard Reimbursements Section.
   E. If Medicare is recorded as primary or secondary and the patient does not complete their enrollment in Medicare before the transplant or at the time of transplant, the recipient center shall pay for all Uncovered Complications for the donor who gave a kidney to the patient with the inaccurate financial information recorded in the NKR system.
10. **Donor Follow Up:** Shall be the responsibility of the center that performs the donor nephrectomy.

11. **Donor Organ Packaging**: NKR shall bill the Recipient Center for organ packaging on behalf of the OPO or Member Center. Funds shall be remitted to the OPO or Member Center twice per calendar year at a rate of $1,400 per shipped kidney. If the receiving center identifies any problems with the Organ Packaging, pictures should be emailed to NKR and the problem(s) must be entered in the swap quality system. If packaging problem is reported by the receiving center, the OPO or Member Center responsible for organ packaging will not be reimbursed unless an acceptable Root Cause Corrective Action Plan is provided.

12. **Remote Direct Donation:** Centers who opt into Remote Direct Donation Services have the ability to utilize other opted in centers to perform a nephrectomy for a remote donor. Member Centers opted into Remote Direct Donation agree to:

    A. Work up and perform the nephrectomy for donors whose paired recipient is listed at a different center opted into remote donation services.

    B. Complete donor work up within 6 weeks of donor being transferred from the managing center to the remote center unless there is a special condition, special conditions must be communicated to the managing center.

    C. The standard reimbursements for remote donation services in the Terms and Conditions including Remote Donor Work Up and any additional services provided.

    D. Accept the donor centers criteria and policies on donor evaluation.

## VI. BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Agreement") is by and between Covered Entity ("Member Center") and the National Kidney Registry ("Business Associate"). WHEREAS, Covered Entity and Business Associate are parties to the NKR Service Contract pursuant to which Business Associate provides certain services to Covered Entity. In connection with Business Associate's services, Business Associate may receive, maintain or transmit PHI from or on behalf of Covered Entity, which information is subject to protection under the Federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act, Title XIII of the American Recovery and Reinvestment Act of 2009 (the "HITECH Act"), and related regulations promulgated by the Secretary ("HIPAA Regulations"). Business Associate and Covered Entity agree to the following:

1. **Definitions**
   A. Individual. "Individual" shall have the same meaning as the term "individual" in 45 CFR §160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR §164.502(g).
   B. Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR part 160 and part 164, subparts A and E.
   C. Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.
   D. Security Rule. "Security Rule" shall mean the Security Standards at 45 CFR part 160 and part 164.
   E. Subcontractor. "Subcontractor" shall have the same meaning as the term "subcontractor" in 45 CFR §160.103.

2. **Obligations and Activities of Business Associate**
   A. Use and Disclosure. Business Associate agrees to not use or disclose PHI other than as permitted or required by this Agreement or as required by law.
   B. Appropriate Safeguards. Business Associate agrees to use appropriate safeguards, and comply, where applicable, with the Security Rule to prevent use or disclosure of the PHI.
   C. Reporting. Business Associate agrees to promptly report to Covered Entity any use or disclosure of PHI not permitted by this Agreement.
   D. Mitigation. Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate or its employees, officers, Subcontractors, or agents in violation of the requirements of this Agreement.
   E. Accountings. Business Associate agrees to document and make available to the Covered Entity such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI consistent with HIPAA Regulations.
   F. Compliance with HIPAA Standards. When providing its services the Business Associate shall comply with all applicable HIPAA standards and requirements with respect to the transmission of health information in electronic form in connection with any Covered Transactions.
   G. Subcontractors. Business Associate agrees to ensure that any Subcontractor receiving PHI from Business Associate on behalf of Covered Entity agrees in writing to the same restrictions and conditions that apply through this Agreement to the Business Associate with the exception of Subcontractors that deliver packages where the patient name and address is required for the delivery of a package.

3. **Permitted Uses and Disclosures by Business Associate**
   A. <u>Services Agreement</u>. Except as otherwise limited in this Agreement, Business Associate may use or disclose PHI to perform functions, activities, or services for, or on behalf of, Covered Entity as specified in the NKR Service Contract, provided that such use or disclosure does not violate HIPAA Regulations.
   B. <u>Use for Administration of Business Associate</u>. Except as otherwise limited in this Agreement, Business Associate may use PHI for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.
   C. <u>Reporting Violations of Law</u>. Business Associate may use PHI to report violations of law to appropriate Federal and State authorities, consistent with 45 CFR §164.502(j)(1); provided, however, that Business Associate gives Covered Entity prior written notice of its intention to report any such violation of law and the facts or circumstances related thereto.
4. **Indemnification**.
   A. Business Associate agrees to indemnify, defend and hold harmless Covered Entity and its employees, trustees, members, medical staff, representatives and agents (collectively, the "Indemnitees") from and against any and all claims, obligations, actions, causes of action, suits, debts, judgments, losses, fines, penalties, damages, expenses, liabilities, lawsuits and/or costs incurred by the Indemnitees, to the extent arising or resulting from a breach of this Agreement.
5. **Miscellaneous.**
   A. <u>No Agency Relationship</u>. It is not intended that an agency relationship be established hereby, between Covered Entity and Business Associate for purposes of liability under HIPAA, HIPAA Regulations, or the HITECH Act.
   B. <u>Regulatory References</u>. A reference in this Agreement to a section in HIPAA, HIPAA Regulations, or the HITECH Act, means the section as in effect or as amended or modified from time to time, including any corresponding provisions of subsequent superseding laws or regulations.
   C. <u>Interpretation</u>. Any ambiguity in this Agreement shall be resolved to permit Covered Entity and Business Associate to comply with HIPAA, HIPAA Regulations and the HITECH Act.



# Business Associate Agreement

This Business Associate Agreement ("Agreement") is entered into between University of Colorado Health, on behalf of the members of the University of Colorado Health Affiliated Covered Entity (collectively "Covered Entity") and KidneyLife Foundation, Inc. d/b/a National Kidney Registry, a New York not-for-profit corporation ("Business Associate"), and is made effective on the last date signed below ("Effective Date"). Covered Entity and Business Associate are collectively referred to as "Parties" in this Agreement.

The purpose of this Agreement is to comply with the Privacy, Security, Breach Notification and Enforcement Rules issued by the United States Department of Health and Human Services ("HHS") under the Health Insurance Portability and Accountability Act of 1996 and the provisions of the Health Information Technology for Economic and Clinical Health Act, which is a part of the American Recovery and Reinvestment Act of 2009 (collectively referred to as "HIPAA"), and the Colorado Data Privacy Laws set forth at Colo. Rev. Stat. §§ 6-1-713, 6-1-713.5 and 6-1-716 (collectively with HIPAA referred to as the "Privacy Laws").

## RECITALS

Covered Entity is required to comply with the Privacy Laws' requirements regarding the privacy and security of Protected Information, defined below.

Business Associate has entered into an agreement with Covered Entity ("Services Agreement") pursuant to which Business Associate will render services to or on behalf of Covered Entity involving Protected Information and must comply with the requirements imposed upon it by the Privacy Laws and this Agreement.

NOW THEREFORE, in consideration of the mutual covenants, promises and agreements contained herein, the Parties agree as follows:

### I. Definitions.

A. The following terms shall have the same meaning as those terms are defined by HIPAA: Administrative Safeguards, Breach, Breach Notification Rule, Data Aggregation, Designated Record Set, Disclosure, Electronic Protected Health Information, Enforcement Rule, Individual, Information, Marketing, Minimum Necessary, Physical Safeguards, Privacy Rule, Protected Health Information ("PHI"), Required by Law, Secretary, Security, Security Incident, Security Rule, Subcontractor, Technical Safeguards, Unsecured Protected Health Information, Use, and Workforce Member.

B. The terms Personal Identifying Information ("PII"), Personal Information, and Security Breach shall have the same meaning as those terms are defined by the Colorado Data Privacy Laws.

C. The term Protected Information shall mean, for the purposes of this Agreement, any or all of Protected Health Information, Personal Identifying Information, or Personal Information.

D. The term Business Day means Monday through Friday, except for legal public holidays specified in 5 U.S.C. 6103(a), or any other day declared to be a holiday by federal statute or executive order.

**II.** **Permitted Uses and Disclosures of Protected Information by Business Associate**. Business Associate must, in its capacity as a Business Associate to the Covered Entity:

A. Use and Disclose Protected Information to perform services on behalf of Covered Entity pursuant to the terms of the Services Agreement, provided that such Use or Disclosure would not violate the Privacy Laws if done by Covered Entity.

B. Use and Disclose Protected Information for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate.

C. Use and Disclose Protected Information only in the manner permitted or Required by Law.

D. Obtain reasonable assurances from the Person or Entity to whom it Discloses Protected Information that the Protected Information will remain confidential and be Used or further Disclosed only as permitted or Required by Law, or for the purpose for which it was Disclosed to the Person or Entity, and that the Person or Entity will notify Business Associate of any instances of which it is aware where the confidentiality of the Protected Information has been compromised.

E. Provide Data Aggregation services to Covered Entity as permitted by 45 CFR §164.504(e)(2)(i)(B), but only as required or allowed pursuant to the Services Agreement.

**III.** **Obligations of Business Associate**. Business Associate must, in its capacity as a Business Associate to the Covered Entity, comply with the following obligations:

A. **Comply with Law**. Business Associate must Use and Disclose Protected Information in compliance with all applicable provisions of the Privacy Laws, as amended from time to time. Business Associate acknowledges that its failure to comply with HIPAA or other statutory duties could result in civil and criminal penalties under 42 USC §§ 1320d-5 & 1320d-6.

B. **Proper Uses and Disclosures.** Business Associate must not Use or Disclose Protected Information other than as permitted by the terms of this Agreement or the Services Agreement, or as Required by Law. Business Associate will comply with all obligations imposed by the Privacy Laws applicable to Covered Entity when Using and Disclosing Protected Information on behalf of Covered Entity.

C. **Appropriate Safeguards.** Business Associate must implement and maintain appropriate safeguards to protect the confidentiality, integrity and availability of Protected Information that it creates, receives, maintains, stores, processes or transmits on behalf of Covered Entity. Appropriate safeguards include all Administrative, Physical and Technical Safeguards of the Security Rule and shall include technologies and methodologies prescribed by the Secretary of HHS in applicable HIPAA regulations. Business Associate acknowledges that it has implemented

such safeguards and complies with all applicable policy, procedure, and documentation requirements set forth in the Privacy Laws.

**D. Reporting of Improper Uses or Disclosures, Security Incidents and Breaches.**

(1) **Improper Uses or Disclosures.** Business Associate shall give written notice to Covered Entity's Privacy Officer at privacy@uchealth.org of any Use or Disclosure of PHI not provided for by this Agreement or the Services Agreement no later than three (3) Business Days of becoming aware of such improper Use or Disclosure. A full written report will be provided to the Privacy Officer at privacy@uchealth.org no later than five (5) Business Days from the date Business Associate becomes aware of the improper Use or Disclosure.

(2) **Security Incident.** Business Associate shall give written notice to Covered Entity's Privacy Officer at privacy@uchealth.org of any successful Security Incident no later than three (3) Business Days of becoming aware of such Security Incident, regardless of whether the incident constitutes a Breach as defined in 45 CFR §164.402. A full written report will be provided to the Privacy Officer at privacy@uchealth.org no later than five (5) Business Days from the date Business Associate becomes aware of the incident.

(3) **Breach of Unsecured PHI.** In the event of a Breach of Unsecured PHI that Business Associate accesses, maintains, retains, modifies, records, stores, destroys, or otherwise holds, Uses or Discloses on behalf of Covered Entity, Business Associate shall give written notice of such Breach to Covered Entity's Privacy Officer at privacy@uchealth.org no later than three (3) Business Days of discovering such Breach. A Breach shall be treated as discovered by Business Associate at the point when Business Associate's Workforce Member, Subcontractor or agent is aware, or would be aware by exercising reasonable diligence, of the Breach. A full written report will be provided to the Privacy Officer at privacy@uchealth.org no later than five (5) Business Days from the date Business Associate discovered the Breach.

(4) **Security Breach of Personal Information.** In the event of a Security Breach of Personal Information which Business Associate has been contracted to maintain, store, or process on behalf of Covered Entity, Business Associate shall give written notice of such Security Breach to Covered Entity's Privacy Officer at privacy@uchealth.org no later than three (3) Business Days of discovering such Security Breach. A full written report will be provided to the Privacy Officer at privacy@uchealth.org no later than five (5) Business Days from the date Business Associate becomes aware of the Security Breach. Business Associate shall cooperate with Covered Entity in any ensuing investigation of the Security Breach, including by sharing with the Covered Entity information relevant to the Security Breach.

(5) **Reports.** The full written reports required above shall include, at a minimum:

(a) Identification of each Individual whose Protected Information has been, or is reasonably believed to have been, improperly Used or Disclosed;
(b) Description of what happened, including the date of the improper Use or Disclosure, Security Incident, Breach of Unsecured PHI, or Security Breach of Personal Information and the date of its discovery;
(c) Description of the types of Protected Information that were involved;
(d) Steps affected individuals should take to protect themselves from potential harm;

(e) Identity of who made or caused the improper Use or Disclosure, Security Incident, Breach of Unsecured PHI, or Security Breach of Personal Information and who received the Protected Information;

(f) Description of Business Associates' investigation and responses;

(g) Actions taken by Business Associate to prevent any further improper Use or Disclosure of Protected Information;

(h) Actions taken by Business Associate to mitigate any deleterious effect of the improper Use or Disclosure of Protected Information; and

(i) Additional information as requested by the Covered Entity.

(6) **Mitigation.** Business Associate shall, in consultation with Covered Entity, mitigate, to the extent practicable, any harmful effect to Covered Entity from an improper Use or Disclosure, Security Incident, Breach of Unsecured PHI, or Security Breach of Personal Information caused by Business Associate in violation of the requirements of this Agreement or Services Agreement.

E. **Minimum Necessary.** Business Associate shall only Use and Disclose the minimum amount of Protected Information necessary to accomplish its requirements under the terms of this Agreement and the Services Agreement.

F. **Access to and Amendment of PHI.** If an Individual makes a request for access or for amendment of PHI directly to Business Associate, Business Associate shall forward such request to Covered Entity in writing within five (5) Business Days of its receipt of the request. Covered Entity will be responsible for responding to such requests in accordance with HIPAA. However, to the extent Business Associate maintains PHI in a Designated Record Set, Business Associate shall, at the request of Covered Entity and as specifically directed by the Covered Entity, either make the PHI available to an Individual in compliance with 45 CFR §§164.524 or make amendments to PHI in accordance with 45 CFR §164.526.

G. **Accounting of Disclosures.** Business Associate agrees to document Disclosures of PHI to the extent necessary to allow Covered Entity to respond to a request by an Individual for an accounting of disclosures in accordance with 45 CFR §164.528. At a minimum, such documentation shall include the date of the Disclosure, the name of the entity or person who received PHI and, if known, the address of the entity or person, a brief description of the PHI Disclosed; and a brief statement of the purpose of the Disclosure that reasonably informs the Individual of the basis for the Disclosure. This documentation will be retained for a period of six (6) years following the Disclosure unless it is transferred to the Covered Entity at the termination of this Agreement or the Services Agreement. Upon request by Covered Entity, Business Associate shall provide such documentation to Covered Entity within five (5) Business Days of Covered Entity's request. In the event that an Individual submits a request for an accounting of disclosures directly to Business Associate, Business Associate shall forward such request to Covered Entity in writing within five (5) business days of its receipt of such request. It will be Covered Entity's responsibility to prepare and deliver any such accounting of disclosures to the Individual.

H. **Audits, Inspection, and Enforcement.** Within ten (10) Business Days of Covered Entity's written request, Business Associate shall allow Covered Entity to conduct a reasonable inspection of the facilities, systems, books, records, agreements, and policies/procedures relating to Business Associate's Use and Disclosure of Covered Entity's Protected Information for the purpose of

determining whether Business Associate is in compliance with this Agreement. The fact that Covered Entity inspects, or fails to inspect, does not relieve Business Associate of its responsibility to comply with this Agreement, nor does Covered Entity's failure to detect an unsatisfactory practice constitute acceptance of such practice or a waiver of Covered Entity's enforcement of rights under this Agreement.

**I.** **Governmental Access to Records.** Business Associate agrees to make internal practices, books, records, and policies/procedures relating to its Use and Disclosure of Covered Entity's PHI pursuant to this Agreement available to the Secretary, in a time and manner indicated by the Secretary for purposes of the Secretary determining Covered Entity's HIPAA compliance.

**J.** **Training.** Business Associate agrees to provide timely, adequate training concerning the Privacy Laws to its Workforce Members.

**K.** **Marketing.** Business Associate shall Use and Disclose Protected Information for Marketing only as expressly directed in writing by Covered Entity.

**L.** **Sale of PHI.** Business Associate is prohibited from selling Covered Entity's Protected Information.

**M.** **Business Associate's Agents/Subcontractors.** Business Associate shall ensure that any agent, including a Subcontractor, to whom it provides Covered Entity's Protected Information, agrees in writing to the same terms and obligations that apply to Business Associate through this Agreement.

**N.** **Prevention of Identity Theft.** To the extent Business Associate is a service provider who provides service directly to a financial institution or creditor, Business Associate shall perform all services and conduct all activities under this Agreement and the Service Agreement in accordance with reasonable policies and procedures which are designed to identify, prevent, and mitigate identity theft in accordance with the standards established by 16 CFR Part 681 and other applicable law. Business Associate shall provide such policies and procedures to Covered Entity upon request.

**O.** **Exporting PHI**: Business Associate will not export, nor will it permit its agents and Subcontractors to export, Covered Entity's Protected Information beyond the borders of the United States of America without prior written approval from Covered Entity's Privacy Officer.

**IV.** **Obligations of Covered Entity**. Covered Entity must, in its capacity as a Covered Entity, comply with the following obligations:

**A.** Not Use or Disclose Protected Information in any manner that violates the Privacy Laws or other applicable federal and state laws.

**B.** Not request Business Associate to Use or Disclose Protected Information in any manner that violates the Privacy Laws or other applicable federal and state laws.

**V.** **Term and Termination**

A. **Term**. The term of this Agreement shall be effective as of the Effective Date, and shall continue in effect until terminated as provided by this Agreement or upon termination or expiration of the Services Agreement.

B. **Termination for Cause**. Upon Covered Entity's knowledge of a material breach of this Agreement by Business Associate, Covered Entity shall either provide an opportunity for Business Associate to cure the breach upon mutually agreeable terms or immediately terminate this Agreement and the Services Agreement if cure is not possible or mutually agreeable terms cannot be reached.

C. **Equitable Remedies**. Business Associate acknowledges and agrees that Covered Entity may file an action for an injunction to enforce the terms of this Agreement, in addition to any other remedy Covered Entity may have. Where Covered Entity has knowledge of a material breach by Business Associate, Covered Entity may take proceedings against Business Associate before any Court having jurisdiction to obtain an injunction or any legal proceedings to cure or stop such material breach.

D. **Effect of Termination**. Upon termination of this Agreement for any reason, Business Associate shall return or destroy all Protected Information received from Covered Entity or created or received by Business Associate on behalf of Covered Entity, and shall retain no copies of the Protected Information. This provision includes Business Associate's return of all of Covered Entity's Protected Information in the possession of Business Associate's agents or Subcontractors. Business Associate shall destroy all Protected Information in accordance with the approved technologies and methodologies set out by the Secretary. In the event Business Associate believes that returning or destroying the Protected Information is infeasible, Business Associate shall provide Covered Entity with notification of the conditions that make return or destruction infeasible. Upon mutual agreement of the Parties that return or destruction of Protected Information is infeasible, Business Associate shall extend the protections of this Agreement to such Protected Information and limit further Uses and Disclosures of such Protected Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Information.

VI. **Amendment**. The Parties agree to take such action as is reasonably necessary to amend this Agreement from time to time to comply with the requirements of the Privacy Laws or other applicable law.

VII. **Covered Entity's Limitation on Liability.** Parties acknowledge that University of Colorado Hospital Authority, a member of University of Colorado Health's Afilated Covered Entity, is governed by the Colorado Governmental Immunity Act, C.R.S. § 24-10-101 *et seq.*, which includes provisions limiting its liability in all claims for injury that lie in tort or could lie in tort.

VIII. **Indemnification**. Business Associate shall indemnify, defend and hold harmless Covered Entity and its directors, officers, Subcontractors, Workforce Members, affiliates, agents, and representatives from and against any and all third party liabilities, costs, claims, suits, actions, proceedings, demands, losses and liabilities of any kind (including court costs and reasonable attorneys' fees) brought by a third party, arising from or relating to the acts or omissions of Business Associate or any of its directors, officers, Subcontractors, Workforce Members, affiliates, agents, and representatives in connection with Business Associate's performance under this Agreement, without regard to any limitation or exclusion of damages provision otherwise set forth in the Agreement or the Services Agreement. This indemnification provision shall survive termination of this Agreement.

### IX.  Miscellaneous

**A. Interpretation.** The provisions of this Agreement shall prevail over any provisions in the Services Agreement that may conflict or appear inconsistent with any provision in this Agreement. Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits Covered Entity to comply with the Privacy Laws. If the provisions differ but are permitted by the Privacy Laws, the provisions of this Agreement shall control.

**B. Survival.** The obligations of Business Associate expressly set out in this Agreement shall survive the termination of this Agreement.

**C. No Third-Party Beneficiaries.** Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than Covered Entity, Business Associate and their respective successors or assigns, any rights, remedies, obligations or liabilities whatsoever.

**D. Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado.

IN WITNESS THEREOF, the parties hereto have duly executed this Agreement as of the Effective Date below.

**COVERED ENTITY**                               **BUSINESS ASSOCIATE**
**University of Colorado Health**

By: _____          By: _____

Print Name: Erika Riethmiller                  Print Name: _____

Title: Chief Privacy Officer                    Title: _____

Date: _____          Date: _____